UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:23-cr-070 |
| APIRL EVALYN SHORT | ) | |

### GOVERNMENT'S NOTICE OF EXPERT WITNESS TESTIMONY (DNA and SEROLOGY)

Now comes the United States of America, by and through Jill E. Steinberg, United States Attorney for the Southern District of Georgia, and shows as follows:

Pursuant to Fed. R. Crim. P. 16(a)(1)(G), the Government provides notice to the defense of the following expert witnesses expected to testify pursuant to Fed. R. Evid. 702-705 at the trial of the above-referenced case:

Heather A. Hall, Forensic Biologist, United States Army Criminal Investigation Laboratory (USACIL); Forest Park, Georgia.

### EXPERT

**Heather A. Hall, Forensic Biologist**

Ms. Hall is a Forensic Biologist at the United States Army Criminal Investigation Laboratory (USACIL). Her background, training and other qualifications are included in her curriculum vitae, which has been provided to defense counsel. To reach her scientific conclusions, Ms. Hall relied upon her own qualifications, the software programs described below, standardized protocols and quality assurance measures, and exhibits submitted for examination that are listed in

1

her final report.

I. <u>**Presumptive and Conclusory Blood Testing**</u>

In the case at bar, Ms. Hall conducted presumptive phenolphthalein tests in the laboratory to determine the possible presence of blood on submitted items of evidence. The phenolphthalein test is a presumptive blood test in which the chemical indicator phenolphthalein is used to detect the possible presence of hemoglobin. It relies on the peroxidase-like activity of hemoglobin in blood to catalyze the oxidation of phenolphthalin (the colorless reduced form of phenolphthalein) into phenolphthalein, which is visible as a bright pink color.

To perform the presumptive test, Ms. Hall first visually examined any item believed to contain possible blood. When Ms. Hall visually identified a possible bloodstain, she collected a sample of the stain with a sterile cotton swab. Ms. Hall then added a drop of ethanol to the swab, then a drop of phenolphthalein reagent, and after a few seconds, she applied a drop of hydrogen peroxide. If the swab turned bright pink rapidly, Ms. Hall reported a presumptive positive test for the presence of blood.

If a stain is presumptively positive for blood and a sufficient amount remains, the material in the stain is typically subjected to a confirmatory test. Ms. Hall used a confirmatory test called "ABAcard HemaTrace." Ms. Hall used the test as prescribed by the manufacturer, and USACIL lab protocols, and included the results in her written reports.

II. <u>**General Principals of DNA Analysis**</u>

    A. **The Structure of DNA**

All living things are composed of cells, which typically have a nucleus that regulates metabolism, growth and/or reproduction. In human beings, the nucleus contains chromosomes composed of DNA that encode all of the information necessary to produce a complete human body. Chromosomes store information in the chemical structure of DNA much like a book or a compact disk. The nucleus contains 46 chromosomes, two copies of each of the 23 different human chromosomes. One copy of each chromosome is inherited from an individual's mother and one copy is inherited from an individual's father, giving a child DNA characteristics of both its mother and father. The composition of one's DNA is set at conception and generally remains consistent throughout an individual's lifetime. Generally, the DNA in all nucleated cells in an individual is the same. Thus, DNA extracted from a person's cheek cells, blood, and hair follicles is identical.

Approximately 99 percent of human DNA is the same. Forensic DNA scientists are only interested in the 1 percent of the DNA that varies among people. Inside DNA are unique repeating patters that can be used to differentiate one person from another. In autosomal DNA testing, these patterns, known as short-tandem repeats (STRs), can be measured to define the DNA profile of an individual. Examining this DNA allows scientists to determine an individual's unique DNA profile without that profile revealing personally identifying characteristics or medical conditions. Examiners do so generally by extracting, quantitating, amplifying and analyzing allele repeats at 13-21 loci (or "markers") in the non-coding portion of one's DNA.[1] Autosomal DNA

---

[1] While 13 loci is the standard used in some laboratories, USACIL uses 21 loci.

analysis is the most discriminatory test currently available.[2] There has been no case to date where two people have been found to have matching STR markers in all 21 areas used for comparison (except identical twins).

DNA is especially valuable for investigating violent crimes such as homicides or sexual assaults because blood, semen, saliva, or touch DNA may be left behind by the perpetrator or victim. To compare the victim's or suspect's DNA profile to the recovered crime scene DNA, the laboratory will need to have known biological samples available for a side-by-side comparison. These known samples are called reference samples.

**B. Overview of the DNA Testing Process**

Law enforcement personnel who submit crime scene evidence for DNA analysis must package and seal the evidence and then arrange for its secure delivery to a DNA laboratory. Upon receipt of the evidence, forensic scientists first determine if the evidence might provide DNA by visually examining it for indications of body fluid stains, and then performing testing to determine whether specific body fluids that might contain DNA are present. When possible, forensic scientists analyze only a portion of the stains on the evidence and save the remainder in case future testing is necessary.

---

[2] Other, less discriminatory, types of DNA analysis include mitochondrial testing, which can determine associations between individuals by looking at haplogroups inherited from one's maternal ancestors, and Y-STR testing, which can determine associations between males by looking at an individual's Y-chromosome haplogroup, which one inherits from one's patrilineage.

1. Extraction

Generally, stains on fabric are cut out of the item and the DNA is extracted from the cuttings. For instance, if a sample is submitted on a cotton swab, a DNA examiner will cut a portion of the cotton swab for examination and preserve the rest for any subsequent testing. If the stains are on a hard object, such as a knife, some of the dried body fluid is removed from the object with a cotton swab (known as swabbing an item) and the DNA is extracted from a cutting of the cotton swab. The process used to extract the DNA varies depending on the organic source of the stain and the material containing the stain. In the case at bar, Ms. Hall applied the autosomal DNA testing process.

Ms. Hall places the DNA cuttings into tubes and adds chemicals that break open the cells and release DNA. She then places the tubes into a machine that applies heat and mechanical agitation for approximately 1-2 hours.

2. Separation of DNA from unneeded cell material

When the samples are removed from heat and agitation, a robot separates the DNA from other components of the cells that are unneeded for the examination. This process takes approximately 20 minutes. The remaining DNA is then moved to a new, clean tube. This entire process is automated.

3. Quantitation

Once the DNA is extracted from the evidence, an examiner must engage in quantification. DNA quantification, generally referred to as nucleic acid quantification, is commonly performed to determine the approximate concentration of

DNA in a sample prior to proceeding with downstream experiments. Sample purity is also an important consideration to accurately calculate the amount of DNA in a sample. A small portion of the sample[3] is processed by a machine to determine whether (1) the sample is too concentrated, in which case it must be diluted to achieve a meaningful result; (2) the sample is too diluted, in which case it must be concentrated; and (3) how much DNA in the sample is human (male or female) DNA. If the amount of human DNA present is below a set threshold, the examiner will instruct technicians not process that sample further because there is not enough DNA present to obtain a useful profile. Once the examiner determines sufficient DNA is present and that the sample is sufficiently dilute, the sample proceeds to the automated amplification stage.

    4. <u>Amplification</u>

Following quantification, the DNA undergoes an amplification process known as polymerase chain reaction (PCR). This process, often analogized as biological photocopying, allows scientists to make millions of copies of the portion of DNA with 21 loci that differ from person to person. The amplification process is conducted in a machine that applies primer and a series of heated and cooled rotations, which separates and rejoins the relevant DNA segment. The amplification process gives forensic scientists the ability to analyze minute DNA samples and has allowed DNA analysis to become a much more useful tool for forensic scientists. Ms. Hall used this process to detect DNA profiles using the Applied Biosystems Globalfiler kit.

---

[3] Approximately 2μl of a 50μl sample is consumed in the quantitiation process.

5. Capillary Electrophoresis

After the DNA has been amplified, the newly formed DNA fragments are sorted according to length (i.e., number of short tandem repeats) using automated capillary electrophoresis with gel-facilitated sieving. In general, electrophoresis is performed by adding DNA to a capillary array containing a gelatinous material which contains tiny holes allowing the material to function as a molecular sieve. An electric current is applied, causing the DNA fragments to move. Since it is easier for smaller fragments to move through the material, the smaller fragments move farther than the larger fragments. As a result, at the end of electrophoresis the DNA fragments are sorted by size. The size of the DNA fragments is determined by comparing the distance each fragment moved to the distances moved by the fragments of known size. As different fragments pass across a virtual lens, software creates images that can be interpreted.

6. Interpretation

After the DNA is separated and imaged, the raw data from the automated process is run through the Open Source Independent Review and Interpretation System (OSIRIS).[4] The resulting information is entered into a proprietary software called "ArmedXpert"[5] that produces a readable DNA profile such as the example below:

---

[4] https://www.ncbi.nlm.nih.gov/osiris/

[5] https://nichevision.com/armedxpert/



Ms. Hall then examines the profiles, following USACIL protocols. She then applies her judgment and interpretation, which are based on her training, experience, and USACIL protocols to make edits and notes on the readable profiles and to draw conclusions. Possible conclusions are a "match,"[6] inclusion, exclusion, or inconclusive when compared to a reference sample.

If there is a scientifically probative inclusion, STRmix software is then utilized to calculate a fully continuous probabilistic likelihood ratio. A likelihood ratio is the measure of the strength of support that particular findings give to one proposition against a stated alternative, given certain conditioning information. The reported statistical calculation for an association is capped at 1.0 quintillion.

---

[6] Separate DNA profiles are considered a "match" when complete genotypes are obtained at all loci included in the amplification kit and all of the detected alleles are the same as those in the reference being compared.

8

7. Quality Assurance

In addition to Ms. Hall's examination and interpretation, another, independent DNA examiner at USACIL does his or her own examination and interpretation of the DNA profiles. This is performed during the technical review. The second examiner's conclusions are compared to Ms. Hall's. If both examiners' conclusions are the same, among other requirements, the technical review of the report/notes is approved, and then submitted to an administrative reviewer to ensure compliance with internal reporting regulations. If the examiners' conclusions contain any significant discrepancies, questioned conclusions are elevated to a Technical Leader for review and direction. In this case, the independent examiners' conclusions were the same and there were no discrepancies elevated for further review.

Ms. Hall and other USACIL examiners wear masks, gloves and lab coats while performing any stage of DNA testing. Ms. Hall does not test, in the same extraction batch questioned samples with reference samples. Additionally, Ms. Hall typically groups samples from items recovered from a single location together to protect against cross-contamination. USACIL DNA examiners changes her gloves often and always wipes her gloves with a bleach solution between handling each tube and she never has more than one tube open at a time during DNA extraction.

To ensure that the DNA profile generated from the amplified DNA is representative of the DNA from the evidence sample and not from contamination, and to verify that the testing process is accurate, DNA protocols require forensic DNA scientists to analyze a series of control samples. For each batch of samples processed,

9

at least one positive control, one negative control, one quality assurance sample, and one reagent blank are analyzed along with the DNA samples. The positive control contains the reagents necessary for amplification plus DNA from a source for which the DNA profile is known. Because the scientists know the correct test results for the positive control, it allows them to determine the accuracy and performance of the amplification and analysis processes. The negative control contains all of the reagents used for amplification. The reagent blank contains all of the reagents used to process an item of evidence from extraction through electrophoresis. The quality assurance sample control contains a known DNA profile. DNA from the evidence is not added to these controls, though their contents are amplified. The purpose of the negative control and the reagent blank is to reveal any contamination that is present in the reagents or introduced during the testing process.

Finally, USACIL undergoes numerous audits to ensure its compliance with both internal and national standards and protocols. The USACIL DNA lab is internally audited every year to determine its compliance with ISO/IEC-17025, which sets general requirements for competence of all testing and calibration laboratories in the United States. Additionally, the DNA lab also performs an internal quality assurance audit every year to measure its compliance with FBI QAS Audit Standards, as is required for any laboratory that submits DNA information to FBI's CODIS. The results must include findings and supporting facts. The DNA lab has a Validation Officer who applies and ensures compliance with internal protocols, such as testing

thresholds, and a Technical Leader who is required to approve any deviation from standard procedures.

The DNA lab undergoes an external audit at least every two years, which is conducted by qualified DNA examiners from other accredited laboratories. All auditors have undergone audit training for this purpose. Moreover, USACIL undergoes a laboratory-wide external ISO audit every five years.

The software, reagents, and processes used by the USACIL DNA lab have also undergone validation testing. Once software (such as STRMix) is approved for use by a Technical Leader, all examiners must pass a competency examination pertaining to that software before they use it.

### III. Ms. Hall's Specific Findings, Conclusions, and Opinions

Ms. Hall will testify consistently with her written reports dated April 11, 2024, which has been disclosed to defense counsel previously. To the extent that the information herein contradicts anything stated in Ms. Hall's report, the report shall be controlling. As to each relevant item of evidence, Ms. Hall will testify that a specific item or swab of that item:

1. contained blood (confirmed), showed a chemical indication of blood (presumptive positive), or did not indicate the presence of blood;

2. contained or did not contain other stains or bodily fluids of evidentiary value;

3. contained or did not contain enough genetic material for DNA amplification; and

11

4. contained one or more DNA profiles or partial profiles.

Ms. Hall will opine about the probability of the DNA profile or mixture, if one resulted, from persons identified in this case versus one or more unknown individuals. She will testify that the existence of a single-source DNA profile within a bloodstain is strong evidence that the blood was deposited by the same individual as the DNA. She will also testify that a DNA mixture is not surprising or unusual when the sample at issue is obtained from a public or shared area.

Ms. Hall compared DNA profiles from numbered items of evidence against reference samples obtained from April Short, E.S. (the alleged victim), and others. Ms. Hall found one or more DNA profiles on the following items of evidence:

1. Exhibits 3.2 (swab of blade / KNIFE) – contains a DNA profile that matches E.S. The DNA profile is at least 1.0 quintillion times more likely if it originated from the DNA profile of E.S. than if it originated from an unknown, unrelated individual.

2. Exhibit 4.2 (swab of blade / KNIFE) – contain a DNA profile that matches E.S. The DNA profile is at least 1.0 quintillion times more likely if it originated from the DNA profile of E. S. than if it originated from an unknown, unrelated individual.

3. Exhibit 3.1 (swab of handle / KNIFE) – a DNA mixture was detected, which mixture originated from two individuals. The DNA profile from E.S. is included as a contributor to the mixture. The mixed DNA profile is at least 1.0 quintillion times more likely if it originated from the DNA profile of E.S.

and an unknown, unrelated individual than if it originated from two unknown, unrelated individuals.

4. Exhibit 13.1 (fingernail swabs / APRIL SHORT) -- a DNA mixture was detected, which mixture originated from two individuals. The DNA profile from E.S. is included as a contributor to the mixture. The mixed DNA profile is at least 1.0 quintillion times more likely if it originated from the DNA profile of E.S. and an unknown, unrelated individual than if it originated from two unknown, unrelated individuals.

5. Exhibit 4.1 (swab of handle / KNIFE) – a DNA mixture was detected, which mixture originated from two individuals. The DNA profiles from April Short and E.S. are included as contributors to this mixture. The mixed DNA profile is at least 1.0 quintillion times more likely if it originated from the DNA profile of April Short and E.S. than if it originated from two unknown, unrelated individuals.

6. Other potential witnesses in this case, whose initials are A.S., M.S., and J.S., were excluded as contributors to the interpretable DNA profiles detected and referenced above.

7. Exhibits 3.1, 4.1, and 13.1 showed a chemical indication of blood, but no confirmatory test was conducted due to limited sample.

8. Exhibits 1.1, 8, and 9 – no blood was identified on these exhibits.

IV. **Qualifications**

A copy of the CV for Heather A. Hall, including publications authored in the

last 10 years, if any, and a list of cases in which the witness has provided expert testimony within the last 4 years has been provided to defense counsel prior to the filing of this notice.

V.     **Expert Witness Signed Approval**

Heather A. Hall issued a report detailing her opinions which has been previously provided in discovery to defense counsel. Said report was also signed by her, obviating the need for her to sign this disclosure. *See* Fed. R. Crim. P. 16(a)(1)(G)(v).

## MEMORANDUM OF LAW

The Federal Rules of Evidence provide for the admission of expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact." Fed. R. Evid. 702. Pursuant to Rule 702, a witness, "qualified as an expert by knowledge, skill, experience, training, or education may testify . . . in the form of an opinion or otherwise." *Id.*

Expert testimony is admissible if it is both relevant and reliable, *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)[7], and where it is "the kind that enlightens and informs lay persons without expertise in a specialized field." *United States v. Burchfield*, 719 F.2d 356, 357-58 (11th Cir. 1983). To ensure these elements are present, the trial judge serves as a "gatekeeper." *United States v.*

---

[7] In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court confirmed that *Daubert's* gatekeeping obligation extends to beyond scientific experts to all of the expert matters described in Rule 702. *Kumho Tire*, 526 U.S. 149; *United States v. Paul*, 175 F.3d 906, 910 (11th Cir. 1999) (holding that the trial judge is required to inquire into the areas of relevance and reliability whether the expert testimony is "scientific" or otherwise)).

*Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999) (citing *Daubert*, 509 U.S. at 2796-97). "'[F]ederal district courts . . . perform [this] important gatekeeping function by screening the reliability of all expert testimony, but they have substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable.'" *Majors*, 196 F.3d at 1215 (quoting *Forklifts of St. Louis, Inc. v. Komatsu Forklift, USA, Inc.,* 178 F.3d 1030, 1034 (8th Cir.1999); citing *Kumho Tire,* 526 U.S. at 1174-76).[8]

## CONCLUSION

WHEREFORE, the government requests that the Court permit the above-listed witnesses to testify pursuant to Fed.R.Evid. 702, subject to the government laying the proper evidentiary foundations at trial.

Respectfully submitted,

JILL E. STEINBERG
UNITED STATES ATTORNEY

*/s/ Henry W. Syms, Jr.*
Henry W. Syms, Jr.
Assistant United States Attorney
Georgia Bar No. 695009

---

[8] A district court's decision to admit or exclude expert testimony under Rule 702 is reviewed for abuse of discretion. *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *United States v. Gilliard*, 133 F.3d 809, 812 (11th Cir.1998).

15

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court.

This 5th day of July, 2024.

                                      Respectfully submitted,

                                      ***/s/ <u>Henry W. Syms, Jr.</u>***
                                      Henry W. Syms, Jr.
                                      Assistant United States Attorney
                                      Georgia Bar No. 695009